GEORGE LAMBERT AND MARGARET LAMBERT v. CHARLES WEBER, GERTRUDE WEBER, AND HARRY F. CHIPMAN.

*Land contract—Specific performance—Tender—Bona fide purchaser —Notice.*

1. Before concluding a purchase of real estate the vendee learned that third parties were in possession, as tenants, as claimed by the vendor, which information is held sufficient to put him upon inquiry, and to charge him with a knowledge of all of the facts which he might have learned by making such inquiry of the alleged tenants.
2. The making and depositing in *escrow* of the note of the vendee, to be delivered to the vendor when the vendee was given a good title to and possession of the land contracted for, is not such a payment of money as entitles the vendee to the rights of a *bona fide* purchaser for value.
3. A tender to the vendees in a land contract at their house in a distant part of a large city, late in the afternoon and after banking hours, of a deed of the land contracted for, coupled with a demand for the payment of the purchase price, amounting to a sum larger than the vendees could reasonably be supposed to have with them, and without giving them an opportunity to have the deed examined by their attorney, is not a proper tender of performance on the part of the vendors, and will count for nothing more than an express notice to the vendees that the vendors were insisting upon the acceptance of

such title as they had (there having been a delay in closing the sale on account of an alleged defect in the title), and that the vendees were required to act promptly if they desired to insist upon a specific performance of the contract.

4. Defendants Weber contracted to sell complainants certain land for $3,500, of which $25 was paid down, and $3,475 was to be paid on the delivery of a deed conveying a good and clear title, and of an abstract of title, with tax statements, of the land. Complainants went into possession, soon after which the abstract was furnished, and, on its being submitted to an attorney, the parties were advised that it was necessary to procure a deed from certain heirs in order to perfect the title, and to this end negotiations were had with said heirs, but by reason of the excessive price asked by them the deed was not procured. The defendants finally insisted upon the acceptance of the title as it then stood, claiming that it was good, and that the alleged defect was only an apparent one, they and their grantors having held adverse possession of the land for thirty years, and tendered a warranty deed of the land and an abstract of title, and demanded payment, but not in such a manner as to forfeit complainants' right to a specific performance of the contract because of their refusal to comply with the demand. On the following day complainants offered to accept the title in its then condition, and make such payment, and specific performance is decreed in their favor.

Appeal from Wayne. (Reilly, J.) Argued October 16, 1890. Decided December 5, 1890.

Bill for specific performance of a land contract, and to set aside a subsequent conveyance of the land by defendants Weber to their co-defendant. Complainants appeal from a decree dismissing their bill. Decree reversed, and one entered in accordance with the prayer of the bill. The facts are stated in the opinion.

*John Ward*, for complainants.

*William Look*, for defendants Weber.

*Harry F. Chipman*, defendant, in *pro. per.*

CAHILL, J. Complainants filed their bill in the Wayne circuit court to compel the specific performance by defend-

ants Weber of a contract made with them for the purchase of a piece of land in the city of Detroit, and also to set aside a subsequent conveyance of such land by the Webers to the defendant Chipman. The contract relied on reads as follows:

"$25.00          DETROIT, MICH., April 15, 1889.

"Received of George Lambert and Margaret Lambert, his wife, both of the city of Detroit, Wayne county, State of Michigan, the sum of twenty-five dollars, to apply on thirty-five hundred dollars purchase money, for which we hereby agree to sell and convey to them, of a good and clear title, all of the following described piece of land, situate on the east part of the east half of the south-west quarter of section twenty-one, in town one (1) south, of range twelve (12) east, in the county of Wayne and State of Michigan, containing nine and ninety-nine hundreths acres of land by actual measurement, bounded and described as follows, to wit: Beginning at a post in the north and south quarter line of said section, nineteen chains and sixty-five and a half links (19.65½) north from the south quarter post of said section, to which a swamp oak tree, ten inches in diameter, bears north, 41¾ degrees east, 83½ links distant; thence north on the quarter line aforesaid, ten chains, to a post; thence west along the south line of lot five of the subdivision of the estate of James Dunn, deceased, a distance of nine chains and ninety-eight and one-half links; thence south, parallel to the quarter line aforesaid, ten chains; thence east nine chains and 98½ links to beginning. The balance of thirty-four hundred and seventy-five dollars of said purchase money to be paid at the delivery of the deed and a Burton abstract of title, with tax statements, of said land. And we agree that said Lambert and wife may work the land from the date hereof in the mean time.

"Witness our hands and seals at the city of Detroit, county of Wayne, and State of Michigan, this twenty-second day of April, A. D. 1889.

                    "CHARLES WEBER.
                    "GERTRUDE WEBER.

"In presence of WM. STOLL."

When this contract was executed $25 was paid, and the complainants went into occupation of the land, planted

crops, and cultivated and harvested them as they were ready, having uninterrupted and undisputed possession of the premises from thence on until the difficulty arose between them and the Webers in regard to the performance of the contract as hereinafter stated.

The abstract and tax statement required to be furnished were prepared and certified to May 9, 1889, and on May 11 the parties went to Mr. Stoll with a view to having the abstract examined and the sale closed. Stoll looked over the abstract, and told them there appeared to be a flaw in the title; that he thought it was necessary to procure a deed from the heirs of one Mrs. Marr. With this advice the parties left, with the understanding that the Webers should procure a quitclaim deed from the heirs of Mrs. Marr, and the business was postponed, for the time being, for that purpose. The Webers, within a day or two after, took the abstract to Judge Look, and placed their side of the case in his charge as their attorney. Soon after the Lamberts also called on Judge Look, and requested him to assist in obtaining the deed. Look told them he represented the Webers, and advised them to go to another attorney, which they did, employing John Ward, their present attorney. On the same day, Ward called on Judge Look, and asked for the privilege of examining the abstract. At the same time Ward said to Look that the Marr heirs came to him for advice, and that he could perhaps assist in obtaining the deed. For various reasons the quitclaim deed from the heirs of Mrs. Marr was not obtained. It appears that one of the heirs was a roving young man whose whereabouts were uncertain, and it would seem that he could not be found. The other heirs lived in Detroit, and although Mr. Ward, acting for the Lamberts, and Judge Look, acting for the Webers, each seem to have endeavored in good faith to procure a deed from them, nothing was accomplished.

The Webers claim that these heirs at one time agreed to execute the deed for a nominal consideration, but that they afterwards changed their minds and demanded an unreasonable sum before they would do so. The Webers also claim that their title was good; that the defect pointed out by Mr. Stoll was apparent only; that they and their grantors had been in the actual, undisputed possession, of the premises for 30 years; and that their title by adverse possession was perfect. They claim that they, at various times, offered to perform this contract by executing a deed to the Lamberts, but that the latter, acting under advice of their counsel, refused to accept a deed unless a quitclaim should also be furnished from the Marr heirs.

Frequent negotiations were had between the parties and their counsel during the summer of 1887, which resulted in nothing definite. On September 18, 1889, Judge Look wrote to two of the heirs, demanding that they execute a deed which he had prepared and delivered to Mr. Ward for them to execute, and saying that if they declined to do so he should at once file a bill against them to quiet the Webers' title. It does not appear that anything came of this letter. Judge Look testified that he had repeated conversations with Mr. Ward at his office in regard to this transaction, in which he expressed the opinion that the title was all right, but also expressed a willingness to do what he could to obtain a quitclaim from the Marr heirs; that somewhere about September 1 he went with Mr. and Mrs. Weber to Mr. Ward's office, and informed Mr. Ward that the Webers were annoying him to such an extent that he was tired of it; that he had made every effort to get the deed from the Marrs, but that the Marrs wanted money, and would not sign unless they were paid.

" Q. You went to Mr. Ward because the matter was becoming monotonous?"

" *A.* Yes, sir.

" *Q.* What had the Webers said?

" *A.* They said they wanted to convey the property and get their money.

" *Q.* Did you tell Mr. Ward that?

" *A.* I have told him that upwards of five times, myself.

" *Q.* What was it that occurred on the last day in Mr. Ward's office?

" *A.* That is the occasion about three weeks before the tender was make. I think it was the morning in the early part of the month of September, I requested Mr. and Mrs. Weber to go with me. * * * We went over to Mr. Ward's office and asked for the deed and the Burton abstract, and got it back, and Mr. and Mrs. Weber both said that they wanted to get rid of it. They said 'We cannot give any better title than we have got.' Mrs. Weber was very much excited.

" *Q.* What was the purpose of taking the Webers there that morning?

" *A.* I wanted to convince these people that we would do as was agreed, and I wanted them to be satisfied, and I stated to Mr. Ward that Mr. Weber had been there several times and wanted to get rid of this matter."

Mr. Ward, when examined as a witness for the complainants, admitted that Judge Look and the Webers called on him as stated, but denies that Judge Look told him that the title was good, or that the Webers then and there offered to execute a warranty deed, and told him that they were willing to convey such title as they had, and could not do any better. He says that Mrs. Weber turned back as she was leaving the office, and said to him, " The Lamberts shall never have that land."

On September 26, the defendants Weber executed a warranty deed to the Lamberts of the land, with full covenants, and late in the afternoon of that day, between 3 and 4 o'clock, defendant Charles Weber, accompanied by a justice of the peace and John Look, a brother of Judge Look, visited the Lamberts at their house, situated in a remote part of the city, where a tender was

made of the warranty deed and the Burton abstract, and a demand made for the balance of the purchase money. John Look read the deed over to the Lamberts, and told them that they had come there to tender a performance of the contract on the part of the Webers and to demand the payment of the money; that if the Lamberts declined to accept the deed and pay the money he would pay them back $25 that had been paid down when the contract was made, and he tendered them that amount in gold. The testimony is conflicting as to what the Lamberts said in reply to this tender. The complainants testify that they said they wanted their attorney to look over the papers, and if they were right, that they should have the money; that they would hitch up at once and go and see their attorney; that their money was in the bank down in the city, and, if they could get it out, all right; that young Look said they need not do that, and it was arranged that they should meet at Look's office the next forenoon to transact the business. The defendants' witnesses, including the justice of the peace, John Look, and Charles Weber testified that the Lamberts said they would not take the deed nor would they take back the $25; that Lambert asked if they had got the deed from the Marrs, and said they would not take the title at all if the cloud was there.

Whatever the facts may be, this interview was not very important. It was not a proper tender of performance on the part of the Webers for them to visit the house of the Lamberts, in a distant part of the city, late in the afternoon, present a deed, and demand the payment of a large sum of money, without giving them an opportunity to have the deed examined by their attorney, and at a time after banking hours, when it was not reasonable to suppose they would have so large a sum of money with

them.   The transactions on the afternoon of September 26 can count for nothing more than an express notice to the Lamberts that the Webers were insisting upon an accept- ance of such title as they had, and a payment of the money, and called upon the Lamberts to act promptly if they desired to insist upon a specific performance of the contract.

The evidence shows that on the next morning com- plainant George Lambert visited Judge Look's office. The testimony is conflicting as to what took place. Judge Look testified that he told Mr. Lambert that the deed and abstract were there ready to be delivered upon the payment of the money, and asked Lambert whether he was willing to receive them; that he told him that they had several times refused to accept a deed unless the quitclaim from the Marrs was first obtained, and that the Webers were getting tired of it and wanted the mat- ter closed up; that Lambert replied that if the cloud was still on the title he would not take it.   Lambert denies this, but says he called at Judge Look's office on the morning of the 27th with Mr. Ward, his attorney. Mr. Ward testified that he called on Judge Look in the morning of September 27, and told him that, so far as the title was concerned, the Lamberts were willing to take a warranty deed without the quitclaim from the Marrs and pay the money; that Look put the matter off, said he was busy, and at halfpast 1 he went over again and found Judge Look still engaged.   An interview was arranged for at 4 o'clock in the afternoon of that day. Mr. Ward testified that he called at 4 o'clock, as had been arranged, but found Judge Look still engaged, and went away; that he called the next morning, and, find- ing Judge Look still engaged, he wrote and sent him the following note:

"DETROIT, MICH., Sept. 28, 1889."
"JUDGE LOOK,—

"*Dear Sir:* Relating to the Weber-Lambert matter, what I desire in acting for Lamberts is that I have the privilege of examining the deed proposed to be made by the Webers, and the abstract of title of the property to be conveyed. If the record title appears satisfactory, with the exception of the lack of the deed from the Marr children, the Lamberts will accept a full warranty deed from the Webers, and pay the price fixed in the contract for the premises.

"Very truly, JOHN WARD."

Ward testified that he had previously examined the abstract, but did not know whether there had been any change since his examination; that he wanted to look at the abstract down to the date of drawing the deed. Not getting any reply to this note, Mr. Ward says that he went over at 2 o'clock on the afternoon of the 28th, and Judge Look said that he would not do anything about it.

At this point the defendant Chipman appears in the case. Judge Look testified that when Mr. Lambert called on him on the morning of the 27th of September, and again refused to accept the Webers' deed without a quitclaim from the Marr heirs, he advised the Webers to abandon their contract and pay no more attention to the Lamberts; that he could find them another purchaser for the land; and that, with that view, he talked with defendant Chipman, who was an attorney at law having an office adjoining Judge Look's; that he told Mr. Chipman that he thought there was a chance to make some money by buying this land; that the Webers would take $3,500 for it, and he thought it a good bargain at that price; that, after some negotiations, and on the same day, being the 27th of September, Mr. Chipman agreed to purchase the land for $3,500, pay $1,000 down, and give a mortgage back for the balance, and on the same day a deed was drawn up and executed by the Webers to Chip-

man in accordance with this agreement; that in the course of the negotiations Chipman learned for the first time of the fact that the Lamberts were in possession of this land, and he thereupon declined to pay the $1,000 down, until the Lamberts should be removed, and he given possession of the land.    Thereupon it was agreed that he should execute his note for $1,000, and leave the same in escrow until such time as the Webers could give him peaceable possession of the land.    These negotiations do not seem to have been concluded between the Webers and Chipman before the 30th of September, because the mortgage, which was to be given by him for the unpaid purchase money, was executed on that day, and Mr. Chipman testifies that the deed and mortgage were delivered on the same day.

The defendant Chipman claims to be a *bona fide* purchaser of this land from the Webers for value, and without notice that the Lamberts had or claimed any interest. There is nothing in the record to show that Mr. Chipman acted other than in perfect good faith in the purchase of this land, or that he had any other purpose in the transaction than to make what was to be made out of a *bona fide* real estate purchase.    He learned before the negotiations were concluded that the Lamberts were in possession, but he was told at the same time that they were in as tenants, and he was not informed that they had or claimed any other rights.    But as it clearly appears that he learned before his purchase was concluded of the fact that the Lamberts were in possession of the land, this information was sufficient to put him upon inquiry, and he is chargeable with a knowledge of all the facts which he might have learned by making such inquiry of the Lamberts.    It also appears that at the time of the filing of the bill he had not paid anything towards the purchase price.    He cannot, therefore, be considered

or treated as a *bona fide* purchaser for value.   The making and depositing of the $1,000 note, to be delivered when he was given possession of the land, was not such a payment of money as would entitle him to the rights of a *bona fide* purchaser for value.   By the express terms of his bargain, this note was not to be delivered unless he secured a good title, and the possession of the land purchased.

Treating the case, then, as one wholly between the original parties, I think the complainants are entitled to the relief prayed for.   The contract did not contain any definite provision as to when the deed should be made and the money paid.   Complainants were to have a good and clear title.   The money was to be paid "at the delivery of the deed, and a Burton abstract of title, with tax statements."   The parties understood by this that the defendants would show complainants that they had a good title, before they asked them to pay the balance of the purchase money.   It is clear that, when the abstract came to be furnished, all the parties, including counsel on both sides, discovered a defect in the title, more apparent than real, perhaps, and yet one which it was deemed advisable to clear up for the benefit of the title, whoever owned it.   With this in view, efforts were made to procure the necessary deed from the Marr heirs.   It was reasonable that complainants should desire this, and they cannot be treated as in default for thus insisting upon a good title.   Nor were they so treated by defendants.   The tender of the deed on the afternoon of September 26 was an express recognition of the contract as in force at that time.   Judge Look says that he again told Mr. Lambert when he called on the morning of the 27th that the deed was ready, but that the latter refused to accept it.   It appears however by the testimony of Mr. Ward that later

in the same day he called on Judge Look and told him
his clients were willing to take the Weber title as it was,
and would waive the procuring of the deed from the
Marr heirs; that Judge Look was at the time engaged,
but told Mr. Ward to call later, and gave no intimation
that the contract was to be treated as forfeited until on
the afternoon of September 28. This was after Mr. Ward
had given notice that the Lamberts had concluded to
waive the defect in the title and take it as it was. It
was two days before the sale to Chipman was concluded.

Under all the circumstances, the complainants have
acted with only reasonable caution. They are Germans,
unfamiliar with our language, and therefore especially
dependent upon the advice and assistance of counsel.
They seem to have followed such advice, and I think they
did well to do so. So far as appears in this record,
the only delay in closing up the sale has been caused by
the failure of the Webers to cure an apparent defect
in their title, admitting that they have used every effort
to do so. Since complainants have consented to waive
this, a decree must be entered requiring defendants Weber
to execute, acknowledge, and deliver to the complainants
a good and sufficient warranty deed of the land in ques-
tion, upon their payment of the balance of the purchase
money of $3,475, with interest at 6 per cent. per annum
from September 27, 1889, less the costs of this suit to be
taxed, such payment to be made within 30 days after
demand.

The defendant Chipman will be required to reconvey
the land by quitclaim deed to the defendants Weber, and
the latter to discharge the mortgage given by Chipman to
them. The $1,000 note given by Chipman, and left in
escrow, will be delivered up to him to be canceled.

The complainants will recover the costs of both courts,

to be collected only by deducting the same from the purchase money when paid by them as herein provided.

CHAMPLIN, C. J., and LONG, J., concurred. MORSE and GRANT, JJ., did not sit.